**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

—————————————————————
BRUCE GOODMAN                  :
                                         :     No. 2:15-cv-02115-GAM
               Plaintiff,    :
                                         :
             v.                    :
                                         :
MERRILL LYNCH, PIERCE, FENNER &   :
SMITH INC., et al.                 :
                                         :
             Defendants.   :
—————————————————————

## <u>ORDER</u>

AND NOW this _____ day of _____, 2016, upon consideration of Defendants' Motion for Summary Judgment and Plaintiff's Response in Opposition thereto, it is hereby ORDERED and DECREED that Defendant's Motion is DENIED.

**AND IT IS SO ORDERED.**

_____
Gerald A McHugh,                    ,J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

BRUCE GOODMAN                                  :
                                               :        No. 2:15-cv-02115-GAM
                          Plaintiff,           :
                                               :
                    v.                         :
                                               :
MERRILL LYNCH, PIERCE, FENNER &                :
SMITH INC., et al.                             :
                                               :
                          Defendants.          :

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff hereby incorporates by reference the attached Memorandum of Law as if fully set forth at length herein requesting denial of Defendants' Motion for Summary Judgment.

**WEISBERG LAW**

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
David A. Berlin, Esquire
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

BRUCE GOODMAN                                    :
                                                 :       No. 2:15-cv-02115-GAM
                              Plaintiff,          :
                                                 :
            v.                                   :
                                                 :
MERRILL LYNCH, PIERCE, FENNER &                  :
SMITH INC., et al.                               :
                                                 :
                              Defendants.         :

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.    STATEMENT OF FACTS**

1. On March 19, 2012, Plaintiff was employed by Merrill Lynch Wealth Management as a Financial Advisor in the Practice Management Development Program.

2. Plaintiff was hired because of his extensive past experience and, specifically, because of his relationships with his prior employer, TIAA-CREF.  (Exh. B – Deposition of Michael Haberman, 10:11).  Plaintiff's formal business plan included his intent to solicit business from people he had worked with at TIAA-CREF.  Exh. A – Plaintiff's Full Deposition Transcript, 75:21).

3. During the first three months of training, Merrill Lynch did not permit Plaintiff to solicit clients.  (Exh A, 64:15).

4. Around the same time the three month training period ended, TIAA-CREF demanded Plaintiff cease and desist soliciting TIAA-CREF.  As a result of litigation, Plaintiff agreed not to solicit TIAA-CREF clients through December 2012.  Id. at 71:16.

5. Naturally, Plaintiff's performance suffered after he agreed not to solicit former clients – those clients were a key aspect of his initial business plan and the reason Plaintiff was hired by Merrill Lynch.  Id. at 75:21.

6. In Plaintiff's program, Defendant, Michael Haberman was Plaintiff's designated mentor and program coordinator.  Haberman would report Goodman's performance directly to Bowman at periodic monthly meetings. (Exh. B – 75:10).

7. In October 2012, Plaintiff severely injured his back.  Plaintiff was in excruciating pain and visited the emergency room.  Plaintiff notified Defendant, Robert Bowman directly in writing via e-mail that Plaintiff could not come into the office for the next week.  (Defendants' Exh. 8).

8.  Bowman was the supervisor of about 200 people in Merrill Lynch's Philadelphia office. (Exh. C – Bowman Deposition, 8:10).  Bowman was the decision maker regarding Plaintiff's employment.

9. On October 31, 2012, Plaintiff emailed Bowman again and explained that his back had not improved.  Plaintiff asked what Merrill Lynch's procedures were since Plaintiff was out of work for more than 3 days.  (Defendants' Exh. 9).

10. Bowman response via e-mail was: "Lynn, please find out what we do here."  Id.  Lynn Moore was Bowman's assistant.

11. Moore advised Plaintiff via e-mail to contact Aetna and the Personnel Center regarding medical leave and benefits.  Id.

12. Plaintiff called the Personnel Center which referred him to Aetna.  (Exh. A – 180:20). Plaintiff called Aetna and was told that this issue would be handled on a local level with his

manager (Bowman; whom Plaintiff had initially contacted).  <u>Id</u>.   Aetna also told Plaintiff it did not have a long term disability plan.  <u>Id</u>. at 91:4.

13. Despite being in a "tremendous amount of pain," Plaintiff returned to work.  <u>Id</u>. at 96:25.

14. Plaintiff told both Moore and Haberman about his injury when he returned.  (Exh. A – 97:10).

15. Plaintiff showed Moore a doctor's note evidencing his back injury.  (Defendants' Exh. 10).  (Exh. D – Lynn Moore Deposition, 15:13).

16.  Plaintiff also told Moore that he wanted to take painkillers while working.  Moore told Plaintiff not to take painkiller medication because he would not be able to concentrate enough to do the job.  (Exh. A – 173:12).  As a result, Plaintiff did not take painkillers at work other than Tylenol even though he was still in extreme pain.

17. Plaintiff met with Haberman around December 2012.  <u>Id</u>. at 100:16.  Plaintiff explained that he was still in pain and that it was difficult to sit all day hunched over a desk.  Plaintiff said it would be better to work from home periodically.  <u>Id</u>. at 102:10.  Plaintiff also told Haberman that he was experiencing depression and anxiety.  Haberman advised Plaintiff to "do some stretching exercises."  <u>Id</u>. at 101:7.

18. Haberman also warned that Plaintiff was not reaching his hurdles, notwithstanding the issue with TIAA-CREF and Plaintiff's excruciating back pain.  <u>Id</u>. at 101:14.  Haberman told Plaintiff that Bowman would fire him if he did not meet his hurdles.  <u>Id</u>. at 101:25.

19. Haberman, for his part, recalls going to Starbucks around this time with Plaintiff.  Haberman said Plaintiff "wasn't feeling good."  "He was really down."  They went to Starbucks to talk outside the office.  (Exh. B – 24:10).

20. Haberman admits that Bruce discussed accommodations with him and complained about cold

calling.  Id. at 45:17:

> Q Okay. So when you went to Starbucks, Bruce was still working there, at that time. At
> any time, when Bruce was working at the company, did he tell you that, you know, there
> were things that -- accommodations that would help him do his job?
>
> A Yeah. After he shared with me about the back, he mentioned cold calling and being --
> yeah. He had mentioned that, you know, there's other means. Putting two and two
> together, I brought up cold calling because that was something at the desk and calling on
> the phone.
>
> Q Did Bruce say that being at the desk was a problem because of his back? I'm trying to
> connect it to the injury. Or was he just saying this is a different way I want to do the job
> for whatever reason or was it because of his injury?
>
> A So that's a good question because from what I recall it was a lot of reasons why it
> wasn't working, right. And those -- those reasons, to be fair and direct, became plentiful.
> At a later stage, the back was discussed and, again, as I recall, I remember going --
> saying, let's go to Starbucks and having that dialogue.

21. Margie Quinn was a wealth management advisor and vice president who reported to Robert

Bowman at Merrill Lynch.  (Exh. G – 7:3).

22. Quinn testified that if her mentee told her that they had an injury that was affecting their

ability to work, but with reasonable accommodations of some kind, things will be better, she

would tell Bowman.  Id. at 44:2.

23. Strangely, Haberman does not recall discussing Plaintiff's back problem with Bowman –

even after Plaintiff explained his injury in detail to Haberman at Starbucks.  (Exh. B – 33:24;

50:13).

24. Haberman mainly recalls discussing Plaintiff's performance with Bowman at monthly

meetings.  Id. at 60:2.

25. On January 18, 2013, Plaintiff met with Bowman to discuss Plaintiff's performance.  Plaintiff

explained to Bowman that he was in severe pain because of his back injury.  Plaintiff also

said experiencing migraine headaches as a result of being in the office all day making cold

calls.  Plaintiff showed Bowman his medication called Relpax.  Plaintiff said he was

depressed as a result of his health situation.  Id. at 107:16.

26. Bowman responded in this meeting by saying he did not care about Plaintiff's "personal

problems."  Id. at 108:2.

27. Bowman made clear that if Plaintiff did not reach his performance hurdles, Plaintiff would be

placed on probation and then terminated.  Id.

28. Bowman also questioned why Plaintiff was not always at his desk.  Id. at 108:21.  Plaintiff

said he was either out soliciting business, or if he did not feel good, working at home.

29. Plaintiff specifically requested to Bowman that he be able to walk around help his

performance.  Bowman denied Plaintiff's request.  Plaintiff explained:

> Q Okay. And, by the way, why does walking around help your performance?
> A Because I can go solicit clients, and sitting down for long periods of time is -- was agony.
> Q Did Bob Bowman tell you this verbally or in writing or both?
> A Verbally and in writing. He sent an e-mail saying he wanted people on the phone from 8:00 in the morning till 6:00 at night, five or six or seven days a week.

30. In fact, on October 8, 2012, Bowman sent an e-mail to everyone in Plaintiff's program

reminding them to have solid work habits.  Specifically, the e-mail said,

> I expect trainees to work an entire day from 8 am to 4:30 pm … Successful business people usually begin their day at 8 am or earlier.  Very successful business people also work late hours, especially early in their careers.  You should be here two to three nights per week and most Saturdays…I view all of these items as simple **base line requirements** to begin a successful career.  (Exh. E).

31. Plaintiff also requested to work from home to Haberman and Merrill Lynch's benefits

department.  (Exh. A – 178:1):

> A Yeah. You never get the same person.  Its part of HR, I assume. I don't know their organizational structure, but I was told to call benefits by Lynn Moore.
> Q So you were told to call benefits, which is part of HR, and you did that?

A Right, yeah.
Q So you contacted HR?
A Absolutely I did.
Q How many times?
A Several times.
Q More than five?
A No.
Q More than three?
A Probably about three times to get clarification on the policies and never got it.
Q All right. So you just named a bunch of people that you requested to work from home. What was the response from all of those people?
A They disapproved of it.
Q Specifically?
A They said it was -- I couldn't do it, to be in the office, sit at your desk, make phone calls. They didn't understand the level of pain and the agony and the torture that I was going through.

32. In spring 2013, Bowman made multiple derogatory comments to Plaintiff regarding his disabilities. Bowman said, "I'm going to tell you what I tell my kids. Get up in the morning and control the way you feel. You can control the way you feel." (Exh. A, 138:3).

33. Plaintiff again explained to Bowman that he had depression, anxiety, pain, and sleeplessness and the loss of a relationship with a woman due to the treatment of Merrill Lynch. Bowman responded that he did not "give a shit." "I don't care. It's your personal problems." Bowman said, "If you don't quit, you're going to commit suicide. You're going to kill yourself." He said, "I want to know what you're going to by the end of the week." Id. at 138:6.

34. Around May 2013, Plaintiff was given a Final Written Warning and placed on probation by Bowman. (Defendants' Exh. 11).

35. Defendant, Administrative Manager John Rufo also told Plaintiff, "You're like a guy who swings an axe with the wrong side of an axe" – implying that Plaintiff was dumb. Id. at 139:6.

36. Rufo also told Plaintiff, "So Bowman is going to fire you. Are you going to get a job at the Home Depot next?" Id. at 140:6.

37. Plaintiff at one point asked Rufo why accounts were not distributed to him (towards generating business).  Rufo responded, "We have a policy on how accounts are distributed, so that we don't get sued by people like Liz (a former employee who was a gay female)." Plaintiff replied, "Well, I'm a protected class myself."  To which Rufo responded, "They don't do anything for old, fat white guys."  Id. at 139:13.

38. Strangely, Defendants admit that multiple other employees in Plaintiff's program also performed poorly but none of those people were terminated.  These people included: Tony Tran (about age 27), Alejandro Sosa (about age 24), and Ryan Hamilton (about age 25). (Exh. A – 121:21; 124:2; 126:9).

39. Sosa told Plaintiff he did not meet his hurdles.  Id. at 124:11.  Sosa eventually transferred to work for his father in another Merrill Lynch office in Florida.  (Exh. C – 79:10).

40. Hamilton told Plaintiff that he also did not meet his hurdles.  (Exh. A – 126:9)

41. Lynn Moore testified that Tran was on the low end of the program's rankings.  (Exh. D – 35:21).

42. Plaintiff asked Tran and Hamilton whether they received the same treatment from Bowman that he received.  Tran and Hamilton told Plaintiff that Bowman never threatened to fire them – Bowman encouraged them.  (Exh. A – 185:2).  Bowman told Tran, "Everything will be fine.  We'll take care of you."  Id.

43. Hamilton did not even receive probation.  Id. at 128:8.

44. Tran received probation but was given the opportunity to "team up" with an established financial advisor named John Mallick.  (Exh. C – 60:3).  Plaintiff was never given an opportunity to team up with a financial advisor.

45. There is no evidence in the record that Tran's performance improved during his probationary period. Lynn Moore, for example, could not recall whether Tran's numbers improved before his twelfth month which was an important month for tracking employees in Plaintiff's program. (Exh. D – 55:14).

46. Strangely, John Rufo (who was the person responsible for tracking performance) remembers Plaintiff's performance but does not remember Tran's performance. Rufo also does not remember whether Tran ever reached his performance hurdles. (Exh. F – Rufo Deposition, 45:5).

47. In fact, Rufo told Plaintiff that "production credits" were artificially shifted from another financial advisor to Tran so that Tran would meet his hurdles and not be terminated. (Exh. A – 123:12).

48. Bowman testified that his employment decisions were totally performance based. (Exh. C, 66:12):

> Q Okay. Was there any sort of official policy regarding how much time you actually needed to be in the office?
> A No.
> Q Okay. You know, earlier I think you said something like, Well, this guy was out but he was making his numbers, so -- I'm just saying -- so that was okay? Was it okay if you're out of the office, but you're –
> A Yeah. Yes. It was okay.
> Q So it was really just -- it was totally performance based, whether you were in the office or not in the office?
> A Yes.

49. Bowman testified that Plaintiff's absenteeism was not a reason for his probation. Id. at 35:8:

> Q Okay. Was the absenteeism a reason for Bruce's probation?
> A No. Oh, no. No. It was the accounts and assets and performance.
> Q Okay.
> A It was all performance based.

50. Notwithstanding, Bowman also testified that a key reason Tran remained with the company

was that Tran was in the office "every day, 12 hours a day." Id. at 60:4.

51. Bowman had also sent the aforesaid e-mail to the entire program regarding office hour

requirements. (Exh. E).

52. Bowman's directives were inconsistent according to Plaintiff. (Exh. A – 195:21):

> Q Okay. And you mentioned earlier that Mr. Bowman didn't frankly care where you
> were, as long as you were bringing in accounts and producing revenue; right, for the
> firm?
> A He didn't care with the other guys, but for me he did.
> Q Now, you mentioned Ryan Hamilton. He had an injury, and he was given
> accommodations; right?
> A Yeah.
> Q So why do you feel like you were treated differently?
> A Because I was sick and old.

53. Plaintiff testified that the younger program employees were able to go out of the office and

nobody said a word. Id. at 104:12.

54. Haberman testified that being out of the office was a part of the financial advisor job. (Exh. B

– 80:24:

> There's many ways in this business we've learned that you can bring in business. Being in
> front of -- the number one way to do it is being with new prospective clients and
> engaging them in a meeting context, which could be at a business meeting, a breakfast
> meeting, a lunch meeting, at their home, at their business, whatever it maybe, to forge a
> relationship and find common ground to validate a relationship.
>
> Id. at 81:15:
> Q: Is there a reason why somebody can't do that from home, for example?
> A You know, what we look for at the end of the day is if someone is bringing in business
> and meeting their goals. I think as long as folks are compliant, they're doing the right
> thing for clients, and the practices that they take on to engage clients and grow their
> business are within reason and sensible, you know, it would be something we would
> encourage. There's all kinds of ways to do it. And I personally have business in multiple
> states. I'm on a plane. I'm going somewhere. I'm meeting someone. I have a breakfast
> meeting. It's actually more common and encouraged to actually get out and see folks and
> to bring them in as clients. But before you get there, you need to initiate the dialogue.
> And that's commonly done through a phone, at the office, in some means, email, contacts,
> et cetera, to get to that point.

55. In fact, Plaintiff testified that he could make appointments with doctors and visit hospitals along with Tony Tran (for the purpose of generating business clients – not for treatment). At one point, Plaintiff said he had about 50 appointments. Strangely, being out of the office was only considered a problem in Plaintiff's case. (Exh. A – 104:18).

56. Plaintiff's disability required flexibility. For example, Plaintiff sometimes had blinding migraine headaches. Other times, Plaintiff had sleeplessness even after taking Ambien and could not fall asleep until 5 a.m. In these instances, Plaintiff would not be able to come to the office. Id. at 105:11. No rational explanation was ever given for why Plaintiff could not sometimes make cold calls from home.

57. Plaintiff was a successful financial advisor for 25 years. Plaintiff had a track-record of performing the job well and Plaintiff knew how to generate business. Id. at 106:2.

58. Plaintiff requested accommodations in spite of a hostile work environment. Id. at 182:18:

> Q Did the hostile treatment prevent you from asking for accommodations ever?
> A Yeah. I mean, I was worried that I was going to be fired, sure. It took a lot for me to even explain my personal situation in that environment.
> Q So what you're telling me is you were afraid to ask for accommodations?
> A Yeah. I was afraid to explain my medical situation. I was afraid to ask for accommodations. I got the courage enough to do it, but then I was afraid I was going to be retaliated against continuously. It was incredibly stressful.

59. Finally, around the end of August or beginning of September 2013, Plaintiff complained directly to John Rufo about the hostile work environment. Rufo responded, "Oh, that's your angle, huh? And walked away." Id. at 183:11.

60. Just a few days later, on September 4, 2013, Plaintiff was terminated by Bowman at a meeting in which Rufo attended. Id. at 110:10.

61. Plaintiff requested that his lawyer and human resources attend the meeting but Bowman refused. Id.

62. Plaintiff has looked for work since his termination. With a termination on his record, and now having been out of work for several years and not having a license or book of business, Plaintiff cannot find a new position. Id at 166:21. He has interviewed with companies such as Vanguard, Fidelity and PNC. Id. at 154:6.

63. Plaintiff has treated with a psychiatrist as a result of his emotional distress caused by Defendants' aforesaid actions. Id. at 159:14.

64. Plaintiff ended a relationship as a result of his depression which occurred during his employment at Merrill Lynch. Id. at 160:7.

65. The termination has created a very difficult financial situation for Plaintiff's family – Plaintiff has two children in college. Id. at 162:16.

## II.    STANDARD

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038 (1977). When considering a motion for summary judgment, this Court shall grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, this Court should resolve all reasonable doubts and inferences in favor of the nonmoving party. Arnold Pontiac–GMC, Inc. v. General Motors Corp., 700 F.Supp. 838, 840 (W.D.Pa.1988).

The inquiry into whether a "genuine issue" of material fact exists has been defined by the Supreme Court as whether "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material." Id.

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); accord Fed.R.Civ.P. 56 c. Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 c.

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J.1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must

identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Andersen</u>, 477 U.S. at 256–57. "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements ....'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir.1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.1991))

    In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Credibility determinations are the province of the factfinder. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir.1992).

    When applying the correct standard, Plaintiff's Complaint is sufficiently specific and Defendants' Motion should be denied.

## III.   <u>ARGUMENT</u>

### 1.  <u>Defendants retaliated against Plaintiff because of his accommodation requests and subsequent related complaints</u>

    A prima facie case of retaliation requires that a plaintiff show that (1) he engaged in protected conduct; and (2) because of this conduct, (3) the employer took adverse employment action against him. See <u>Charlton v. Paramus Bd. of Ed.</u>, 25 F.3d 194, 201 (3d Cir.1994). <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340–41 (3d Cir.2006).

    An inference of retaliation exists when an employee is terminated shortly after engaging in protected activity. Alone, temporal proximity may not be enough to defeat summary judgment when the temporal relationship is not unusually suggestive or is too attenuated to create a genuine issue of fact. *See* <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3d Cir.2000) (citing <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir.1997)). However,

"[w]here the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment." <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,</u> 503 F.3d 217, 233 (3d Cir.2007). Courts have found adverse action by employers to be "unusually suggestive" where, for example, a plaintiff was discharged two days after his employer received his EEOC claim. <u>Jalil v. Avdel Corp.,</u> 873 F.2d 701, 708 (3d Cir.1989).

> a. *There is a clear link between Plaintiff's complaints and Defendants' adverse actions*

The record is clear that Plaintiff made multiple requests for accommodations (verbally and in writing) after Plaintiff suffered a serious back injury.  Plaintiff's specific requests for accommodations included: taking pain killers, working from home periodically, and being able to walk around away from his desk.

Plaintiff made requests to Lynn Moore, Mike Haberman, Robert Bowman, and the Merrill Lynch benefits department.

Not only did Plaintiff initially request accommodations, but he ongoing complained about being denied accommodations to Haberman, Bowman and John Rufo.

> b. *Plaintiff suffered adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights*

In the employment discrimination context, "An action is an adverse employment action if a reasonable employee would have found the action materially adverse, which means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 10.4A.1, Title VII.

The standard for an adverse employment action is not limited to conduct that affects the terms or conditions of employment, but is expanded to include any action that would have

"dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Davis v.</u>
<u>City of Newark</u>, 285 F. App'x 899, 904 (3d Cir. 2008) (citing <u>Burlington N. & Santa Fe Ry. Co.</u>
<u>v. White</u>, 548 U.S. 53, 68 (2006)). Nonetheless, "petty slights, minor annoyances, and simple
lack of good manners will not create such deterrence;" rather, retaliation is actionable only where
it produces material injury or harm sufficient to deter opposition to or reporting of discriminatory
employment practices. <u>Burlington</u> N., 548 U.S. at 68.

    After Plaintiff complained, he was met with fierce opposition by Bowman:

    Bowman said, "I'm going to tell you what I tell my kids.  Get up in the morning and
control the way you feel.  You can control the way you feel."

    Bowman said he did not "give a shit." "I don't care. It's your personal problems."

    Bowman said, "If you don't quit, you're going to commit suicide.  You're going to kill
yourself."  He said, "I want to know what you're going to by the end of the week."

    John Rufo also told Plaintiff, "You're like a guy who swings an axe with the wrong side
of an axe."

    Rufo said, "So Bowman is going to fire you.  Are you going to get a job at the Home
Depot next?"

    Plaintiff at one point asked Rufo why accounts were not distributed to him (towards
generating business).  Rufo responded, "We have a policy on how accounts are distributed, so
that we don't get sued by people like Liz (a former employee who was a gay female)."  Plaintiff
replied, "Well, I'm a protected class myself."  To which Rufo responded, "They don't do
anything for old, fat white guys."

    Plaintiff testified that the hostile work environment hampered his ability to even ask for
accommodations:

Q Did the hostile treatment prevent you from asking for accommodations ever?
A Yeah. I mean, I was worried that I was going to be fired, sure. It took a lot for me to
even explain my personal situation in that environment.
Q So what you're telling me is you were afraid to ask for accommodations?
A Yeah. I was afraid to explain my medical situation. I was afraid to ask for
accommodations. I got the courage enough to do it, but then I was afraid I was going to
be retaliated against continuously. It was incredibly stressful.

Finally, around the end of August or beginning of September 2013, Plaintiff complained

directly to John Rufo about the aforesaid/hostile work environment.  Rufo responded, Oh, that's

your angle, huh? And walked away."

Just a few days later, on September 4, 2013, Plaintiff was terminated by Bowman at a

meeting in which Rufo attended.

    c. *Defendants reason for placing Plaintiff on probation and then terminating*
      *Plaintiff was a pretext*

A plaintiff can make a showing of pretext by submitting evidence that either (a) casts

sufficient doubt upon the legitimate reason proffered by Defendant so that the factfinder could

reasonably conclude that the Defendant's stated reason is a fabrication; or (b) allows the

factfinder to infer that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir.1994).

Here, Defendants argue Plaintiff was placed on probation and terminated for poor

performance – false. The record shows significant direct and circumstantial evidence which raise

questions about Defendants' motivations and credibility.

It is uncontested that several other comparator employees in Plaintiff's program also

struggled including: Tony Tran, Alejandro Sosa, and Ryan Hamilton (all between the ages of 20

and 30 years old).  None were terminated.  Hamilton was not even put on probation.

It is especially notable that Tran was given preferential treatment compared to Plaintiff.

Tran received probation but was given the opportunity to "team up" with an established financial

advisor named John Mallick.  Plaintiff was never given an opportunity to team up with a financial advisor.

There is no evidence in the record that Tran's performance improved during his probationary period.  On the contrary, Rufo told Plaintiff that "production credits" were artificially shifted from another financial advisor to Tran so that Tran would meet his hurdles and not be terminated.

Tran and Hamilton both told Plaintiff that Bowman never threatened to fire them – Bowman encouraged them.  Bowman told Tran, "Everything will be fine.  We'll take care of you."

Bowman testified that he was only concerned about was whether employees are "making their numbers."  It is not believable then that only Plaintiff was terminated when other employees were also performing poorly.

Plaintiff eventually complained about the hostile work environment to Rufo and was terminated <u>within days</u>.

To be "unusually suggestive" of a retaliatory motive, "the temporal proximity must be immediate."  <u>Lorah v. Tetra Tech, Inc.</u>, 541 F. Supp. 2d 629, 636 (D. Del. 2009).

Questions of motivation and credibility are jury questions.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir.1992).

As a matter of law, this Court respectfully cannot grant summary judgment.  There is significant direct and circumstantial evidence (ulterior motives, disparate treatment, hostile work environment, and temporal proximity) in this record to support a finding of retaliation.  A jury should decide.

**2.  <u>Defendants discriminated against Plaintiff because he was disabled</u>**

In order for a plaintiff to establish a prima facie case of discrimination under the Americans with Disabilities Act (ADA), the plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination. Americans with DisabilitiesAct of 1990, §§ 3(2), 101(8), 102(a), <u>42 U.S.C.A. §§ 12102(2)</u>, <u>12111(8)</u>,<u>12112(a)</u>.

Discrimination under the Americans with Disabilities Act (ADA) encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations of disabilities. Americans with Disabilities Act of 1990, § 102(a), (b)(5)(A), 42 U.S.C.A. § 12112(a), (b)(5)(A).

    *a.   Plaintiff explicitly requested accommodations*

The record shows that after Plaintiff suffered a serious back injury, Plaintiff notified his employer of his need for accommodations multiple times – verbally and in writing.

Plaintiff e-mailed Bowman directly (Defendants' Exhs. 8 and 9), who referred Plaintiff to Lynn Moore.  Lynn Moore referred Plaintiff to Aetna, who referred Plaintiff back to Bowman.

Plaintiff's requests for accommodations included: taking pain killers, working from home periodically, and being able to walk around away from his desk.  All were denied.

Haberman admits that Plaintiff discussed accommodations with him and complained about cold calling:

> Q Okay. So when you went to Starbucks, Bruce was still working there, at that time. At any time, when Bruce was working at the company, did he tell you that, you know, there were things that -- accommodations that would help him do his job?
>
> A Yeah. After he shared with me about the back, he mentioned cold calling and being -- yeah. He had mentioned that, you know, there's other means. Putting two and two

together, I brought up cold calling because that was something at the desk and calling on the phone.

Q Did Bruce say that being at the desk was a problem because of his back? I'm trying to connect it to the injury. Or was he just saying this is a different way I want to do the job for whatever reason or was it because of his injury?

A So that's a good question because from what I recall it was a lot of reasons why it wasn't working, right. And those -- those reasons, to be fair and direct, became plentiful. At a later stage, the back was discussed and, again, as I recall, I remember going -- saying, let's go to Starbucks and having that dialogue.

Margie Quinn was a wealth management advisor and vice president who reported to Robert Bowman at Merrill Lynch.  Quinn testified that if her mentee told her that they had an injury that was affecting their ability to work, but with reasonable accommodations of some kind, things will be better, she would tell Bowman.

Strangely, Haberman does not recall discussing Plaintiff's back problem with Bowman – even after Plaintiff explained his injury in detail to Haberman at Starbucks.  Haberman mainly recalls discussing Plaintiff's performance with Bowman at monthly meetings.

It is unbelievable that Haberman would not have discussed Plaintiff's condition with Bowman as a potential explanation for Plaintiff's poor performance.  Haberman's testimony raises significant doubts about Haberman's and Bowman's credibility.

Haberman's testimony (specifically the Starbucks conversation) proves Defendants were not only on notice of Plaintiff's injuries, but that Defendants knew Plaintiff was requesting accommodations to perform his job duties.  Planitiff also testified that he requested accommodations from Bowman <u>directly</u>.  Defendants explicitly denied and ignored those accommodation requests.

      *b.  Plaintiff was qualified to perform the essential functions of his job with an accommodation notwithstanding his application for social security disability insurance*

Defendant is incorrect that Plaintiff's SSDI application bars Plaintiff's disability discrimination claims. Defendant cites *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), in support of its argument notwithstanding that the Supreme Court in *Cleveland* specifically holding that "an SSDI claim and an ADA claim can comfortably exist side by side."

The *Cleveland* Court stated that "[a]n SSA representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'" *Cleveland*, 526 U.S. at 802. In analyzing this distinction, the Court reasoned that:

> For one thing, as we have noted, the ADA defines a "qualified individual" to include a disabled person "who ... can perform the essential functions" of her job " *with reasonable accommodation.*"
> . . . .
> By way of contrast, when the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of "reasonable accommodation" into account, *nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI*. See Memorandum from Daniel L. Skoler, Associate Comm'r for Hearings and Appeals, SSA, to Administrative Appeals Judges, reprinted in 2 Social Security Practice Guide, App. § 15C[9], pp. 15-401 to 15-402 (1998).
> *Id.* at 803. (emphasis added)

Thus, "an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of her job." *Id.* at 804.

The *Cleveland* Court stated that when "faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim." *Id.* at 807. Indeed, in *Cleveland*, the Court actually permitted the plaintiff to proceed on her ADA claims, notwithstanding her representation on her SSDI application that she was "disabled" and "unable to work." *See generally, Cleveland, supra.*

As the Court noted in *Detz v. Greiner Industries, Inc.*, 346 F.3d 109 (3d Cir. 2003), "the District Court here properly observed that 'scenarios may exist in which it is possible for a plaintiff's ADEA claim to be consistent with his or her earlier application for Social Security benefits.' *Detz*, 224 F. Supp. 2d at 916." *Detz*, 346 F.3d at 117.  The Court went on to hold that, "[g]uided by *Cleveland* and *Motley*, the first question we must ask is whether the positions taken by [the plaintiff] in his SSDI Application and his ADEA claim genuinely conflict. **We answer this question on a case-by-case basis, by examining the unique facts** presented by [the plaintiff's] claim. *See Motley*, 196 F.3d at 164." *Id.* at 118 (emphasis added).

Here, Lynn Moore told Plaintiff he could not take painkillers and Plaintiff reluctantly complied.  A lay jury will understand that anyone would perform better if they were not in agony.

Plaintiff did not need to sit at his desk every day making cold calls in order to generate business.  Defendants hired Plaintiff because he was a successful financial advisor for 25 years.  Plaintiff had a track-record of performing the job well and Plaintiff knew how to generate business.

In fact, sitting at his desk was counter-productive because it directly caused Plaintiff severe pain.

Plaintiff's disability required flexibility.  For example, Plaintiff sometimes had blinding migraine headaches.  Other times, Plaintiff had sleeplessness even after taking Ambien and could not fall asleep until 5 a.m.  In these instances, Plaintiff would not be able to come to the office.  No rational explanation was ever given for why Plaintiff could not sometimes make cold calls from home.

Plaintiff also testified that he could solicit clients by walking around. Plaintiff made appointments with doctors and visit hospitals along with Tony Tran (for the purpose of generating business clients – not for treatment). At one point, Plaintiff said he had about 50 appointments. Strangely, being out of the office was only considered a problem in Plaintiff's case.

    *c.   Plaintiff was discriminated against because of his disability*

As described above, Plaintiff was given probation and terminated in retaliation for his accommodation requests and complaints.

Bowman testified that the difference between Tran and Plaintiff was that Tran was in the office "every day, 12 hours a day." Bowman also required office hours in an e-mail to the entire program (Exh. E). Then, Bowman contrarily testified that as long as employees met performance goals it did not matter whether they were in the office.

Haberman admitted:

> There's many ways in this business we've learned that you can bring in business. Being in front of -- the number one way to do it is being with new prospective clients and engaging them in a meeting context, which could be at a business meeting, a breakfast meeting, a lunch meeting, at their home, at their business, whatever it maybe, to forge a relationship and find common ground to validate a relationship.

In actuality, Defendants shifted their policies and procedures to suit whatever goals they desired. Plaintiff was clearly and intentionally treated differently than others in his program.

But for Defendants' accommodation denials, Plaintiff could have performed the essential functions of the job.

**IV.**    **CONCLUSION**

The record shows significant direct and circumstantial evidence which raise questions about Defendants' motivations and credibility.  The jury should evaluate the credibility of these witnesses and evaluate the objective reasonableness of their conduct.

Plaintiffs respectfully request this Honorable Court deny Defendants' Motion for Summary Judgment consistent with the attached proposed Order.

**WEISBERG LAW**

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
David A. Berlin, Esquire
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUCE GOODMAN | : | |
| | : | No. 2:15-cv-02115-GAM |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERRILL LYNCH, PIERCE, FENNER & | : | |
| SMITH INC., et al. | : | |
| | : | |
| Defendants. | : | |

## **CERTIFICATE OF SERVICE**

I, David A. Berlin, Esquire, hereby certify that on this 28th day of March, 2016, true and correct copies of the foregoing Response in Opposition to Summary Judgment were served via e-filing upon the following parties:

Karen P. Gaster, Esq.
Lauren Cell, Esq.
Rubin Fortunato & Harbison, P.C.
10 S. Leopard Rd.
Paioli, PA 19301

**WEISBERG LAW**


/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
David A. Berlin, Esquire
Attorneys for Plaintiff