IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUCE GOODMAN | : | |
| | : | No. 2:15-cv-02115-GAM |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INC., et al. | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS**

Plaintiff, Bruce Goodman, by and through his undersigned attorneys, Weisberg Law, hereby files the following counter-statement of material, and in support thereof, avers as follows:

1. On March 19, 2012, Plaintiff was employed by Merrill Lynch Wealth Management as a Financial Advisor in the Practice Management Development Program.

2. Plaintiff was hired because of his extensive past experience and, specifically, because of his relationships with his prior employer, TIAA-CREF. (Exh. B – Deposition of Michael Haberman, 10:11). Plaintiff's formal business plan included his intent to solicit business from people he had worked with at TIAA-CREF. Exh. A – Plaintiff's Full Deposition Transcript, 75:21).

3. During the first three months of training, Merrill Lynch did not permit Plaintiff to solicit clients. (Exh A, 64:15).

4. Around the same time the three month training period ended, TIAA-CREF demanded Plaintiff cease and desist soliciting TIAA-CREF. As a result of litigation, Plaintiff agreed not to solicit TIAA-CREF clients through December 2012. Id. at 71:16.

5. Naturally, Plaintiff's performance suffered after he agreed not to solicit former clients – those clients were a key aspect of his initial business plan and the reason Plaintiff was hired by Merrill Lynch.  Id. at 75:21.

6. In Plaintiff's program, Defendant, Michael Haberman was Plaintiff's designated mentor and program coordinator.  Haberman would report Goodman's performance directly to Bowman at periodic monthly meetings. (Exh. B – 75:10).

7. In October 2012, Plaintiff severely injured his back.  Plaintiff was in excruciating pain and visited the emergency room.  Plaintiff notified Defendant, Robert Bowman directly in writing via e-mail that Plaintiff could not come into the office for the next week.  (Defendants' Exh. 8).

8.  Bowman was the supervisor of about 200 people in Merrill Lynch's Philadelphia office. (Exh. C – Bowman Deposition, 8:10).  Bowman was the decision maker regarding Plaintiff's employment.

9. On October 31, 2012, Plaintiff emailed Bowman again and explained that his back had not improved.  Plaintiff asked what Merrill Lynch's procedures were since Plaintiff was out of work for more than 3 days.  (Defendants' Exh. 9).

10. Bowman response via e-mail was: "Lynn, please find out what we do here."  Id.  Lynn Moore was Bowman's assistant.

11. Moore advised Plaintiff via e-mail to contact Aetna and the Personnel Center regarding medical leave and benefits.  Id.

12. Plaintiff called the Personnel Center which referred him to Aetna.  (Exh. A – 180:20). Plaintiff called Aetna and was told that this issue would be handled on a local level with his

manager (Bowman; whom Plaintiff had initially contacted).  Id.  Aetna also told Plaintiff it did not have a long term disability plan.  Id. at 91:4.

13. Despite being in a "tremendous amount of pain," Plaintiff returned to work.  Id. at 96:25.

14. Plaintiff told both Moore and Haberman about his injury when he returned.  (Exh. A – 97:10).

15. Plaintiff showed Moore a doctor's note evidencing his back injury.  (Defendants' Exh. 10).  (Exh. D – Lynn Moore Deposition, 15:13).

16.  Plaintiff also told Moore that he wanted to take painkillers while working.  Moore told Plaintiff not to take painkiller medication because he would not be able to concentrate enough to do the job.  (Exh. A – 173:12).  As a result, Plaintiff did not take painkillers at work other than Tylenol even though he was still in extreme pain.

17. Plaintiff met with Haberman around December 2012.  Id. at 100:16.  Plaintiff explained that he was still in pain and that it was difficult to sit all day hunched over a desk.  Plaintiff said it would be better to work from home periodically.  Id. at 102:10.  Plaintiff also told Haberman that he was experiencing depression and anxiety.  Haberman advised Plaintiff to "do some stretching exercises."  Id. at 101:7.

18. Haberman also warned that Plaintiff was not reaching his hurdles, notwithstanding the issue with TIAA-CREF and Plaintiff's excruciating back pain.  Id. at 101:14.  Haberman told Plaintiff that Bowman would fire him if he did not meet his hurdles.  Id. at 101:25.

19. Haberman, for his part, recalls going to Starbucks around this time with Plaintiff.  Haberman said Plaintiff "wasn't feeling good."  "He was really down."  They went to Starbucks to talk outside the office.  (Exh. B – 24:10).

20. Haberman admits that Bruce discussed accommodations with him and complained about cold calling. Id. at 45:17:

> Q Okay. So when you went to Starbucks, Bruce was still working there, at that time. At any time, when Bruce was working at the company, did he tell you that, you know, there were things that -- accommodations that would help him do his job?
>
> A Yeah. After he shared with me about the back, he mentioned cold calling and being -- yeah. He had mentioned that, you know, there's other means. Putting two and two together, I brought up cold calling because that was something at the desk and calling on the phone.
>
> Q Did Bruce say that being at the desk was a problem because of his back? I'm trying to connect it to the injury. Or was he just saying this is a different way I want to do the job for whatever reason or was it because of his injury?
>
> A So that's a good question because from what I recall it was a lot of reasons why it wasn't working, right. And those -- those reasons, to be fair and direct, became plentiful. At a later stage, the back was discussed and, again, as I recall, I remember going -- saying, let's go to Starbucks and having that dialogue.

21. Margie Quinn was a wealth management advisor and vice president who reported to Robert Bowman at Merrill Lynch. (Exh. G – 7:3).

22. Quinn testified that if her mentee told her that they had an injury that was affecting their ability to work, but with reasonable accommodations of some kind, things will be better, she would tell Bowman. Id. at 44:2.

23. Strangely, Haberman does not recall discussing Plaintiff's back problem with Bowman – even after Plaintiff explained his injury in detail to Haberman at Starbucks. (Exh. B – 33:24; 50:13).

24. Haberman mainly recalls discussing Plaintiff's performance with Bowman at monthly meetings. Id. at 60:2.

25. On January 18, 2013, Plaintiff met with Bowman to discuss Plaintiff's performance. Plaintiff explained to Bowman that he was in severe pain because of his back injury. Plaintiff also

said experiencing migraine headaches as a result of being in the office all day making cold calls. Plaintiff showed Bowman his medication called Relpax. Plaintiff said he was depressed as a result of his health situation. Id. at 107:16.

26. Bowman responded in this meeting by saying he did not care about Plaintiff's "personal problems." Id. at 108:2.

27. Bowman made clear that if Plaintiff did not reach his performance hurdles, Plaintiff would be placed on probation and then terminated. Id.

28. Bowman also questioned why Plaintiff was not always at his desk. Id. at 108:21. Plaintiff said he was either out soliciting business, or if he did not feel good, working at home.

29. Plaintiff specifically requested to Bowman that he be able to walk around help his performance. Bowman denied Plaintiff's request. Plaintiff explained:

> Q Okay. And, by the way, why does walking around help your performance?
> A Because I can go solicit clients, and sitting down for long periods of time is -- was agony.
> Q Did Bob Bowman tell you this verbally or in writing or both?
> A Verbally and in writing. He sent an e-mail saying he wanted people on the phone from 8:00 in the morning till 6:00 at night, five or six or seven days a week.

30. In fact, on October 8, 2012, Bowman sent an e-mail to everyone in Plaintiff's program reminding them to have solid work habits. Specifically, the e-mail said,

> I expect trainees to work an entire day from 8 am to 4:30 pm … Successful business people usually begin their day at 8 am or earlier. Very successful business people also work late hours, especially early in their careers. You should be here two to three nights per week and most Saturdays…I view all of these items as simple **base line requirements** to begin a successful career. (Exh. E).

31. Plaintiff also requested to work from home to Haberman and Merrill Lynch's benefits department. (Exh. A – 178:1):

> A Yeah. You never get the same person. Its part of HR, I assume. I don't know their organizational structure, but I was told to call benefits by Lynn Moore.
> Q So you were told to call benefits, which is part of HR, and you did that?

>A Right, yeah.
>Q So you contacted HR?
>A Absolutely I did.
>Q How many times?
>A Several times.
>Q More than five?
>A No.
>Q More than three?
>A Probably about three times to get clarification on the policies and never got it.
>Q All right. So you just named a bunch of people that you requested to work from home. What was the response from all of those people?
>A They disapproved of it.
>Q Specifically?
>A They said it was -- I couldn't do it, to be in the office, sit at your desk, make phone calls. They didn't understand the level of pain and the agony and the torture that I was going through.

32. In spring 2013, Bowman made multiple derogatory comments to Plaintiff regarding his disabilities. Bowman said, "I'm going to tell you what I tell my kids. Get up in the morning and control the way you feel. You can control the way you feel." (Exh. A, 138:3).

33. Plaintiff again explained to Bowman that he had depression, anxiety, pain, and sleeplessness and the loss of a relationship with a woman due to the treatment of Merrill Lynch. Bowman responded that he did not "give a shit." "I don't care. It's your personal problems." Bowman said, "If you don't quit, you're going to commit suicide. You're going to kill yourself." He said, "I want to know what you're going to by the end of the week." Id. at 138:6.

34. Around May 2013, Plaintiff was given a Final Written Warning and placed on probation by Bowman. (Defendants' Exh. 11).

35. Defendant, Administrative Manager John Rufo also told Plaintiff, "You're like a guy who swings an axe with the wrong side of an axe" – implying that Plaintiff was dumb. Id. at 139:6.

36. Rufo also told Plaintiff, "So Bowman is going to fire you. Are you going to get a job at the Home Depot next?" Id. at 140:6.

37. Plaintiff at one point asked Rufo why accounts were not distributed to him (towards generating business). Rufo responded, "We have a policy on how accounts are distributed, so that we don't get sued by people like Liz (a former employee who was a gay female)." Plaintiff replied, "Well, I'm a protected class myself." To which Rufo responded, "They don't do anything for old, fat white guys." Id. at 139:13.

38. Strangely, Defendants admit that multiple other employees in Plaintiff's program also performed poorly but none of those people were terminated. These people included: Tony Tran (about age 27), Alejandro Sosa (about age 24), and Ryan Hamilton (about age 25). (Exh. A – 121:21; 124:2; 126:9).

39. Sosa told Plaintiff he did not meet his hurdles. Id. at 124:11. Sosa eventually transferred to work for his father in another Merrill Lynch office in Florida. (Exh. C – 79:10).

40. Hamilton told Plaintiff that he also did not meet his hurdles. (Exh. A – 126:9)

41. Lynn Moore testified that Tran was on the low end of the program's rankings. (Exh. D – 35:21).

42. Plaintiff asked Tran and Hamilton whether they received the same treatment from Bowman that he received. Tran and Hamilton told Plaintiff that Bowman never threatened to fire them – Bowman encouraged them. (Exh. A – 185:2). Bowman told Tran, "Everything will be fine. We'll take care of you." Id.

43. Hamilton did not even receive probation. Id. at 128:8.

44. Tran received probation but was given the opportunity to "team up" with an established financial advisor named John Mallick. (Exh. C – 60:3). Plaintiff was never given an opportunity to team up with a financial advisor.

45. There is no evidence in the record that Tran's performance improved during his probationary period. Lynn Moore, for example, could not recall whether Tran's numbers improved before his twelfth month which was an important month for tracking employees in Plaintiff's program. (Exh. D – 55:14).

46. Strangely, John Rufo (who was the person responsible for tracking performance) remembers Plaintiff's performance but does not remember Tran's performance. Rufo also does not remember whether Tran ever reached his performance hurdles. (Exh. F – Rufo Deposition, 45:5).

47. In fact, Rufo told Plaintiff that "production credits" were artificially shifted from another financial advisor to Tran so that Tran would meet his hurdles and not be terminated. (Exh. A – 123:12).

48. Bowman testified that his employment decisions were totally performance based. (Exh. C, 66:12):

> Q Okay. Was there any sort of official policy regarding how much time you actually needed to be in the office?
> A No.
> Q Okay. You know, earlier I think you said something like, Well, this guy was out but he was making his numbers, so -- I'm just saying -- so that was okay? Was it okay if you're out of the office, but you're –
> A Yeah. Yes. It was okay.
> Q So it was really just -- it was totally performance based, whether you were in the office or not in the office?
> A Yes.

49. Bowman testified that Plaintiff's absenteeism was not a reason for his probation. Id. at 35:8:

> Q Okay. Was the absenteeism a reason for Bruce's probation?
> A No. Oh, no. No. It was the accounts and assets and performance.
> Q Okay.
> A It was all performance based.

50. Notwithstanding, Bowman also testified that a key reason Tran remained with the company was that Tran was in the office "every day, 12 hours a day." Id. at 60:4.

51. Bowman had also sent the aforesaid e-mail to the entire program regarding office hour requirements. (Exh. E).

52. Bowman's directives were inconsistent according to Plaintiff. (Exh. A – 195:21):

> Q Okay. And you mentioned earlier that Mr. Bowman didn't frankly care where you were, as long as you were bringing in accounts and producing revenue; right, for the firm?
> A He didn't care with the other guys, but for me he did.
> Q Now, you mentioned Ryan Hamilton. He had an injury, and he was given accommodations; right?
> A Yeah.
> Q So why do you feel like you were treated differently?
> A Because I was sick and old.

53. Plaintiff testified that the younger program employees were able to go out of the office and nobody said a word. Id. at 104:12.

54. Haberman testified that being out of the office was a part of the financial advisor job. (Exh. B – 80:24:

> There's many ways in this business we've learned that you can bring in business. Being in front of -- the number one way to do it is being with new prospective clients and engaging them in a meeting context, which could be at a business meeting, a breakfast meeting, a lunch meeting, at their home, at their business, whatever it maybe, to forge a relationship and find common ground to validate a relationship.
>
> Id. at 81:15:
> Q: Is there a reason why somebody can't do that from home, for example?
> A You know, what we look for at the end of the day is if someone is bringing in business and meeting their goals. I think as long as folks are compliant, they're doing the right thing for clients, and the practices that they take on to engage clients and grow their business are within reason and sensible, you know, it would be something we would encourage. There's all kinds of ways to do it. And I personally have business in multiple states. I'm on a plane. I'm going somewhere. I'm meeting someone. I have a breakfast meeting. It's actually more common and encouraged to actually get out and see folks and to bring them in as clients. But before you get there, you need to initiate the dialogue. And that's commonly done through a phone, at the office, in some means, email, contacts, et cetera, to get to that point.

55. In fact, Plaintiff testified that he could make appointments with doctors and visit hospitals along with Tony Tran (for the purpose of generating business clients – not for treatment). At one point, Plaintiff said he had about 50 appointments. Strangely, being out of the office was only considered a problem in Plaintiff's case. (Exh. A – 104:18).

56. Plaintiff's disability required flexibility. For example, Plaintiff sometimes had blinding migraine headaches. Other times, Plaintiff had sleeplessness even after taking Ambien and could not fall asleep until 5 a.m. In these instances, Plaintiff would not be able to come to the office. Id. at 105:11. No rational explanation was ever given for why Plaintiff could not sometimes make cold calls from home.

57. Plaintiff was a successful financial advisor for 25 years. Plaintiff had a track-record of performing the job well and Plaintiff knew how to generate business. Id. at 106:2.

58. Plaintiff requested accommodations in spite of a hostile work environment. Id. at 182:18:

> Q Did the hostile treatment prevent you from asking for accommodations ever?
> A Yeah. I mean, I was worried that I was going to be fired, sure. It took a lot for me to even explain my personal situation in that environment.
> Q So what you're telling me is you were afraid to ask for accommodations?
> A Yeah. I was afraid to explain my medical situation. I was afraid to ask for accommodations. I got the courage enough to do it, but then I was afraid I was going to be retaliated against continuously. It was incredibly stressful.

59. Finally, around the end of August or beginning of September 2013, Plaintiff complained directly to John Rufo about the hostile work environment. Rufo responded, "Oh, that's your angle, huh? And walked away." Id. at 183:11.

60. Just a few days later, on September 4, 2013, Plaintiff was terminated by Bowman at a meeting in which Rufo attended. Id. at 110:10.

61. Plaintiff requested that his lawyer and human resources attend the meeting but Bowman refused. Id.

62. Plaintiff has looked for work since his termination.  With a termination on his record, and now having been out of work for several years and not having a license or book of business, Plaintiff cannot find a new position.  Id at 166:21.  He has interviewed with companies such as Vanguard, Fidelity and PNC.  Id. at 154:6.

63. Plaintiff has treated with a psychiatrist as a result of his emotional distress caused by Defendants' aforesaid actions.  Id. at 159:14.

64. Plaintiff ended a relationship as a result of his depression which occurred during his employment at Merrill Lynch.  Id. at 160:7.

65. The termination has created a very difficult financial situation for Plaintiff's family – Plaintiff has two children in college.  Id. at 162:16.

**WEISBERG LAW**

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
David A. Berlin, Esquire
Attorneys for Plaintiff